Filed 8/2/13  P. v. Aknin CA1/4
Received for posting 8/6/13
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEAN CLAUDE AKNIN,<br><br>        Defendant and Appellant. | A130256<br><br>(San Mateo County<br>Super. Ct. No. SC067512) |

I.
INTRODUCTION

Defendant Jean Claude Aknin was convicted by jury of forcible rape, assault with intent to commit rape, and related charges and enhancements.  In this appeal, he makes two principal arguments.  First, he argues that his trial counsel was ineffective for failing to move to suppress certain evidence before trial and for failing to object to some testimony and alleged prosecutorial misconduct.  Second, he argues that the evidence is insufficient to support the rape conviction.  We reject these arguments, but we agree with the parties that the conviction of assault with intent to commit rape must be reversed because the crime is a lesser included offense of rape.  We also agree with the People that the trial court erred in sentencing and that Aknin's sentence must be corrected.[1]

---

[1] Aknin also filed a petition for a writ of habeas corpus (No. A138091), asserting claims of ineffective assistance of trial counsel and prosecutorial misconduct.  We address that petition in a separate order filed concurrently herewith.

1

## II.
## FACTUAL AND PROCEDURAL
## BACKGROUND

*A.    The Facts*

The parties dispute many facts, but we begin by discussing some that are uncontroverted.  After work on the evening of August 21, 2008, Aknin went out to eat and drink.  According to him, he drank the equivalent of about seven beers over six hours.  When he was finished, he asked a bartender to call a cab, and when the cab arrived he told the driver that he wanted to find some girls and party.

A.F. was working as a prostitute on the streets of Redwood City that evening.  She worked for a pimp who went by the name of "Gorilla."  The cab driver pointed A.F. out to Aknin and told him that she was " 'a girl who will party with you.' "  The cab pulled over, and Aknin and A.F. agreed on a price for sex.

Aknin asked the driver to take them to the Garden Motel on Broadway.  No rooms were available.  According to A.F., Aknin declined an invitation to use a room she had rented in a different motel.  The two then walked from the Garden Motel to a nearby 7-Eleven, and A.F. used Aknin's cellular phone outside of the store.  It is at this point that their stories diverge.

A.F. testified that Aknin became aggressive, and she told him that she wanted to end their association.  She stated that she started to walk away, but she was then grabbed from behind, dragged into an alley, and choked.  She testified that she lost consciousness and, when she came to, found herself naked from the waist down.  She stood up and yelled for help.  She does not recall having any type of sexual relations with Aknin, and she does not know how her pants were removed.  She was uncertain if she had been sexually assaulted, but at trial she testified:  "Pretty sure I was.  I know I was.  In my heart, it tells me I was."

A.F. testified that a man who was nearby, later identified as Eddie Griffith, arrived at the scene after she screamed, told her he would "get him," and chased after Aknin.  Another man, later identified as Colin Beaumont, took A.F. to a motel room where he

2

was staying so she could wash her face. He gave her a pair of pants to wear and told her that the police were on the way.

Aknin testified and gave a different account of the events. He stated that after A.F. used his cellular phone, she went into the 7-Eleven store alone, spoke with a man he later identified as Griffith, exited the store, and started walking with Aknin back to the motel. According to Aknin, A.F. suggested they go into the alley to have sex. Once in the alley, A.F. pulled her pants down, pulled one leg out of her pants, squatted down, rolled a condom onto his penis with her mouth and fingers, and initiated oral sex. He stated he could not become fully erect, told A.F. that they were done, pulled the condom off and threw it aside, and zipped up his pants.

Aknin testified that when he refused to continue sexual relations, A.F. demanded his money, pointed to Griffith who was waiting nearby, and told Aknin that Griffith had a gun. Aknin testified that he was afraid for his life, lunged forward, grabbed A.F.'s neck, and pushed backwards. According to Aknin, both he and A.F. fell to the ground. He landed on top of her holding her neck, pushed himself up while still holding her neck, and then ran away.

Other than the events at the 7-Eleven store and in the alley, many other facts are undisputed. It is undisputed that A.F. sustained injuries, including a black eye, bloodshot eyes, bruises on her neck, and scrapes on her shoulder and knee. Although Aknin does not deny these injuries, he disagrees about the manner in which A.F. sustained them. Photographs of A.F.'s injuries were shown to the jury.

The parties also do not dispute that several items were found at the scene, including a used tampon, a used condom, A.F.'s cellular phone, and A.F.'s pants. Photographs of the scene showing these items were also shown to the jury.

And the parties do not dispute the results of DNA and other forensic examinations, although, as we will discuss in more detail below, they disagree whether some of these examinations were lawful. The forensic results revealed that Aknin and A.F. had a sexual encounter but were inconclusive as to whether the encounter was oral, vaginal, or both. Swabs taken from Aknin's scrotum and penis revealed A.F.'s DNA. A.F. was the

3

source of DNA on the outside of the used condom found at the scene, and Aknin and A.F both contributed to DNA on the inside of the condom. The interior of the condom tested positive for one of the components of semen, but no sperm cells were found. Nucleated epithelial (skin) cells were found on the outside of the condom. These cells came from an orifice, but no conclusion could be drawn as to which one. Low levels of amylase, an enzyme found in bodily fluids, were also detected on the outside of the condom. Amylase is found in high concentrations in saliva and in low concentrations in vaginal fluids. But again, no conclusion was reached whether the condom was necessarily or exclusively used for an oral encounter.

Other forensic findings related to A.F.'s blood, but they were also inconclusive as to the nature of the sexual encounter. Blood was detected on swabs of A.F.'s vagina taken after the incident, but no blood was detected on the condom or on the swabs from Aknin's scrotum, penis, or hands. A.F. was menstruating at the time of the incident, and she had been using a tampon that evening. She testified that she did not know what happened to her tampon, although a used one was found at the scene. Tests revealed that her DNA, but not Aknin's, was on the tampon. A DNA test of a bloodstain on the back wall of the alley showed it was A.F.'s.

The only people other than Aknin and A.F. who witnessed some aspects of the incident in the alley were Griffith and Beaumont, and at the trial the parties disputed the reliability of their testimony. Griffith was staying at the Garden Motel at the time and was sharing his room with Beaumont. Both men had criminal histories. Griffith was on parole at the time after serving a prison term for rape, and he had been convicted of armed robbery. At the time of the trial, Beaumont was in jail facing charges for being under the influence of crack cocaine and possession of drug paraphernalia. Beaumont admitted to frequently using drugs, and he testified that he and Griffith had drunk beer and smoked marijuana and crack.

Griffith testified that on the night of the incident he left the motel to use the pay telephone at the 7-Eleven store and saw a couple walk by. He had never seen the woman before. After returning to his motel room, he heard a sound that he described as sounding

4

like someone in a football uniform and helmet running into the wall. He went outside, and saw a man whom he identified as Aknin on the ground making what appeared to be digging or swimming motions with his arms. Griffith thought Aknin might be having a seizure and asked if he needed help. Griffith did not see Aknin move his hips up and down, and he acknowledged that he did not see a sexual act. Aknin sprang up. Griffith told the police immediately after the incident that he saw Aknin fumble with his pants as if to pull up a zipper, but at trial he could not recall having seen this. Aknin then fled. Griffith heard a whimpering sound and saw a naked woman on the ground who started to get up. Griffith chased Aknin, suspecting that a sexual assault had occurred. Griffith eventually caught up with Aknin, and Griffith waved over police cars as they arrived.

Beaumont also testified about the incident. He was in his motel room when he heard a sound and went outside. He saw a man, later identified as Aknin, lying on the ground. He testified that he watched him for two to three minutes and did not see him move. He then saw Aknin get up and start running, and Griffith chased after him. Beaumont heard a woman, later identified as A.F., screaming for help. He did not see A.F. having a sexual encounter with Aknin, but he testified at trial that he saw Aknin's hand on A.F.'s neck as she was struggling. A.F. had blood on her face and neck and was not wearing pants. When A.F. got up, she was unsteady on her feet and had trouble maintaining her balance. Beaumont took A.F. to the motel room and gave her a pair of Griffith's pants. A.F. said that she had been raped and used the bathroom to wash the blood off.

As part of his defense, Aknin suggested that Griffith was actually A.F.'s pimp, Gorilla, and that Griffith and A.F. were working together at the time of the incident in a scheme to rob him. A.F. and Griffith denied these suggestions. Whether Griffith was A.F.'s pimp and working with A.F. to rob Aknin became an important issue at the trial.

Griffith testified he had never seen A.F. before seeing her in the 7-Eleven store on the night of the incident and never threatened to rob Aknin. He testified he had never been a pimp or involved with prostitution and did not have a street name or nickname of

5

Gorilla.  He did admit, however, that he had a tattoo of a gorilla on his back, which he testified signified his history with heroin.

Beaumont told a defense investigator before the trial that Griffith was known as Gorilla, and at trial he testified he believed that was because of the tattoo on his back. But Beaumont testified that he never heard anyone call Griffith Gorilla.  Before the trial, Beaumont also told the defense investigator that Griffith had told him he was from Las Vegas and told a police investigating officer that he thought Griffith was from Las Vegas. This mattered because Gorilla apparently had stayed or lived in Las Vegas.  At the trial, however, Beaumont recanted these statements.  He testified that Griffith had never told him he was from Las Vegas and that he had been wrong about Griffith being from Las Vegas, but had thought that was where Griffith was from because most people who have tattoos come from Las Vegas.

After the incident, Aknin was taken into custody and examined, and a sexual-assault examination was performed on A.F.

B.     *The Charges, Verdict, and Sentence*

An information charged Aknin with forcible rape (count 1; Pen. Code, § 261, subd. (a)(2)),[2] assault with intent to commit rape (count 2; § 220, subd. (a)), assault by means of force likely to produce great bodily injury (count 3; § 245, subd. (a)(1)), and battery with serious bodily injury (count 4; § 243, subd. (d)).[3]  As to counts 1 through 3, the information alleged Aknin personally inflicted great bodily injury (under §§ 667.61, subd. (e)(3), 12022.8 as to count 1; under § 12022.7, subd. (a) as to counts 2 and 3).

After a two-week trial, the jury convicted Aknin of all four charges and found the enhancement allegations to be true.  The court sentenced Aknin to a term of 15 years to

---

[2] All statutory references are to the Penal Code unless otherwise stated.  All references to statutes defining criminal offenses or setting out punishments or enhancements refer to the versions of those statutes in effect on August 22, 2008, the date of the charged crimes.

[3] The information also charged that Aknin made a threat in violation of section 422 (count 5).  The People dismissed that charge.

life for rape (count 1). The court stated it was staying the sentences on the other counts under section 654. Aknin timely appealed.

## III.
## DISCUSSION

*A.    Ineffective Assistance:  Failure to Move to Suppress Evidence*

Aknin first argues that his trial counsel was ineffective for failing to file a pretrial motion to suppress evidence obtained by swabbing Aknin's genitals and combing his pubic hairs. He argues these measures were unconstitutional because police did not obtain a warrant, and there were no exigent circumstances justifying a warrantless search. We reject the claim of ineffective assistance.

After he was arrested, Aknin was first taken to a hospital. At the hospital, a nurse asked Aknin if he would consent to a sexual-assault examination, which would include collecting evidence from inside his mouth, underneath his fingernails, and the outside of his genitals. Aknin refused. Police officers then took Aknin to the Redwood City Police Department, and Detective David Cirina spoke to the on-duty deputy district attorney, who told him that a warrant was not necessary to conduct the sexual-assault examination. The police then took Aknin back to the hospital and asked hospital staff to conduct the examination. Nurse Amie Dubois declined, and told Cirina that she would not collect evidence from Aknin's body without Aknin's consent or a court order.

The police then returned Aknin to the police department, where Cirina and another detective collected the evidence from Aknin. Cirina had received training on the collection of sexual-assault evidence. The detectives had Aknin remove each item of clothing individually, and they scraped the underside of his fingernails and obtained a DNA swab from his cheek. Cirina combed Aknin's pubic hairs with a surgical brush to obtain any foreign matter and had Aknin pluck about 15 pubic hairs. Finally, Cirina swabbed both sides of Aknin's penis and both sides of his scrotum.

As mentioned above, the test results showed that A.F. was a contributor to DNA on Aknin's scrotum and penis. A.F. was the source of DNA on the outside of the used condom found at the scene, and Aknin and A.F. were both contributors to DNA on the

7

inside of the condom. No blood was detected on the condom or on the swabs from Aknin's scrotum and penis.

To establish a claim of ineffective assistance of counsel, a defendant must show that (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* at p. 694; *Carter* at p. 1211.) Finally, the defendant must show that " 'the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make.' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 610-611.)

When the alleged deficiency is defense counsel's failure to file a pretrial motion to suppress evidence, a reviewing court considers: (a) whether, based on the law and the information available before trial, a reasonably competent attorney would have filed a motion to suppress; (b) whether the motion would have been successful; and (c) whether a successful motion would have resulted in an outcome more favorable to the defendant. (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438.) Counsel may for tactical reasons forego making a motion even though it has merit. (*Id.* at p. 437, fn. 1.)

We reject Aknin's ineffective assistance argument for two independent reasons. First, the record on appeal does not disclose that defense counsel's decision to forego filing a motion to suppress lacked a tactical basis, and the decision is not of the type for which there could be no satisfactory explanation. (See *People v. Hart* (1999) 20 Cal.4th 546, 623-624, 625, 629, 633; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Fosselman* (1983) 33 Cal.3d 572, 581.) Defense counsel reasonably could have concluded that, given the other clearly admissible evidence, the evidence obtained from the swabbing of Aknin's genitals was not significantly harmful, and was potentially

8

helpful, to Aknin's defense (i.e., his testimony that his only sexual contact with A.F. was consensual oral sex).

The evidence showed A.F. was the source of DNA on the outside of the condom found at the scene, and both Aknin and A.F. were contributors to DNA on the inside of the condom. In light of this evidence establishing Aknin and A.F. had sexual contact of some type, defense counsel reasonably could have concluded that evidence that A.F.'s DNA was on Aknin's scrotum and penis was not harmful to the defense. Indeed, counsel reasonably could have concluded the test results from the swabs of Aknin's genitals were helpful to the defense of the rape charge. Although A.F. was menstruating, no blood was detected on the swabs from Aknin's genitals or on the condom. During his cross-examination of criminalist Mona Ten, defense counsel highlighted these test results, eliciting Ten's testimony that the test used to detect blood is "quite sensitive"; no blood was detected on the swabs of Aknin's penis, scrotum, or hands, or on the condom; and visible blood was found on the swabs of A.F.'s vagina. Counsel also emphasized these points in closing argument, arguing that, "if there was any penetration by [Aknin] into [A.F.'s] vagina, he would have had blood on him."[4]

Because defense counsel reasonably could have concluded the evidence obtained from Aknin's genitals could assist the defense of the rape charge, counsel reasonably could have decided not to move to suppress that evidence.

Second, apart from the question of whether counsel had a tactical purpose, Aknin has not shown his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (See *Strickland, supra,* 466 U.S. at pp. 687-688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.) In light of the limited case law on this issue that was available before trial, we decline to hold that a reasonably competent attorney necessarily would have moved to suppress this evidence, or that

---

[4] Consistent with trial counsel's approach, Aknin argues in his opening appellate brief that a *weakness* in the prosecution case was "the surprising DNA evidence that failed to show blood on Aknin's genitals or the condom he allegedly used[.]"

9

Aknin's counsel was ineffective because he failed to do so. (See *People v. Gonzalez*, *supra*, 64 Cal.App.4th at p. 438.)

No published California case has addressed the constitutionality under the Fourth Amendment of swabbing the exterior of a sexual-assault suspect's genitals and combing his pubic hairs soon after an arrest. The parties cite a few decisions by courts in other jurisdictions reaching different conclusions on this issue, based in part on the evidence presented in those cases. Aknin relies on *State v. Lussier* (Minn. Ct.App. 2009) 770 N.W.2d 581, 589-590, in which the Minnesota Court of Appeals held that a warrantless examination and touching of the defendant's genitals was not valid as a search incident to a lawful arrest, in part because no record evidence showed "body-fluid evidence following a sexual assault" would naturally evaporate or become compromised over time. The court declined to address whether exigent circumstances justified the examination because no record evidence supported that argument and because the argument had not been raised in the trial court. (*Id.* at p. 590, fn. 4.)

Other courts have concluded exigent circumstances can justify a warrantless examination of a sexual-assault suspect's genitals. (See *Ontiveros v. State* (Tex. Ct. App. 2007) 240 S.W.3d 369, 371-372 [warrantless swabbing of defendant's penis was justified; although handcuffed, defendant could have urinated in his pants and damaged fragile DNA evidence]; *Kaliku v. United States* (D.C. Ct.App. 2010) 994 A.2d 765, 779-781 [warrantless swabbing of defendant's penis was justified because DNA evidence could have been contaminated or wiped or rubbed away]; see also *Commonwealth v. Banville* (2010) 931 N.E.2d 457, 465, fn. 2 [genital swab and combing of pubic hair was

10

urgent because delay could have resulted in destruction of evidence; although warrant was obtained, search would have been valid as warrantless search incident to arrest].)[5]

In light of the absence of controlling California case law, as well as the limited case law from other jurisdictions and the differing conclusions reached in those cases, we cannot conclude Aknin's trial counsel provided constitutionally ineffective assistance by failing to file a motion to suppress. (See *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1328-1329 [failure to move to bifurcate prior conviction trial in prosecution for dissuading witness with prior conviction of same offense was not deficient performance because of "absence of controlling case law" and "unsettled state of the law" whether recidivist aspect was element of offense or sentencing provision]; *People v. Foster* (2003) 111 Cal.App.4th 379, 385 [because no California authority established whether certain cross-examination questions were proper, defendant could not establish that his counsel's failure to object to the questions " 'fell below an objective standard of reasonableness' "].)

In addition to the limited applicable case law cited by the parties and discussed above, Aknin suggests other cases would have supported a motion to suppress, such as cases addressing the reasonableness of searches involving intrusions into the body.[6] (See, e.g., *Schmerber v. California* (1966) 384 U.S. 757, 758-759, 767-768, 771-772 [taking of blood sample found reasonable]; *Winston v. Lee* (1985) 470 U.S. 753, 763-766 [proposed

---

[5] In his reply brief, Aknin cites *Lee v. State* (Ind. Ct.App. 2012) 967 N.E.2d 529, 536-539, in which the court distinguished *Ontiveros v. State, supra,* 240 S.W.3d 369, and *Kaliku v. United States, supra*, 994 A.2d 765, and found a lack of evidence of exigent circumstances justifying a warrantless penile swab. *Lee* was decided in 2012, so it was not available to Aknin's trial counsel prior to Aknin's 2010 trial. Even if *Lee* had been decided prior to Aknin's trial, it would not change our conclusion about the state of the law for purposes of deciding Aknin's ineffective assistance claim.

[6] In a supplemental letter brief, Aknin cites *Florida v. Jardines* (2013) ___ U.S. ___, 133 S.Ct. 1409, 1417-1418, in which the United States Supreme Court held the government's use of a trained police dog outside a suspect's home was a "search" within the meaning of the Fourth Amendment. That case did not involve police conduct of the type at issue here. Moreover, it was decided after Aknin's trial, so his counsel could not have been deficient for failing to rely on it as the basis for a motion to suppress.

11

involuntary surgery to remove bullet found unreasonable]; *People v. Bracamonte* (1975) 15 Cal.3d 394, 397-398, 401-404 [forced regurgitation found unreasonable].)[7] We are not persuaded that Aknin's trial counsel was constitutionally ineffective because he did not use this case law to develop a motion to suppress the evidence at issue in this case (obtained through a different type of conduct, i.e., the swabbing of the exterior of Aknin's genitals).[8]

Because Aknin has not established counsel's deficient performance, we need not address the parties' arguments as to whether the performance was prejudicial.  Thus, we do not address (1) whether a motion to suppress would have been successful, or (2) whether a successful motion would have resulted in an outcome more favorable to Aknin.  (See *People v. Gonzalez, supra,* 64 Cal.App.4th at p. 438 [both showings necessary to establish prejudice].)

B.      *Ineffective Assistance:  Failure to Object to Evidence and Argument*

Aknin contends his trial counsel was ineffective by failing to object to certain testimony by prosecution witnesses and certain statements the prosecutor made during

---

[7] In his supplemental letter brief, Aknin also cites *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 617, in which the Supreme Court held the collection and testing of urine samples was a Fourth Amendment search.  The *Skinner* case, like the cases cited in the text, does not address the type of conduct at issue here, and we are not persuaded that Aknin's trial counsel was deficient for failing to rely on it as the basis for a motion to suppress.

[8] We note that the Fourth Amendment argument Aknin now presents was not initially obvious to his appellate counsel—in his opening brief on appeal, Aknin presented no Fourth Amendment claim.  In a subsequent motion for leave to file a supplemental opening brief (which this court granted), Aknin's appellate counsel stated he "was not aware" of the Fourth Amendment issue when he filed Aknin's opening brief and only became aware of it while later researching an unrelated matter.

12

closing argument.[9]  Aknin argues that this evidence and the argument were prejudicial because they bolstered the credibility of A.F. and Griffith.

We consider each instance of allegedly objectionable testimony or argument below, but we find no basis to reverse the judgment on the record before us on direct appeal.  We conclude that much of the testimony and argument that Aknin challenges was proper.  We also conclude that, even if defense counsel could have successfully objected in some instances, Aknin has failed to show prejudice because he has not demonstrated a reasonable probability that, but for counsel's alleged errors, the result of the trial would have been different.  (See *Strickland, supra,* 466 U.S. at pp. 687-688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

1.      Lay Opinion Testimony

Aknin contends that some of the prosecution's lay witnesses—Police Officers David Gilbert and Jesse Bets, Detective David Cirina, and sexual-assault examiner Victoria Galanter—improperly opined that A.F. told the truth in pretrial conversations.  A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800; *People v. Farnam* (2002) 28 Cal.4th 107, 153.)  Aknin cites cases holding a lay witness's opinion about the veracity of another person's particular statements is irrelevant and inadmissible on the issue of the statements' credibility.  (See *People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 239-240; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40; but see *People v. Riggs* (2008) 44 Cal.4th 248, 300 [noting Supreme Court has not decided whether this aspect of *Melton* survived Prop. 8].)  However, a court may, in its discretion, permit questions to a witness about whether another person is telling the truth, if the witness to whom the questions are

_____

[9] In general, trial counsel's failure to object to claimed evidentiary error or prosecutorial misconduct results in a forfeiture of those issues on appeal.  (*People v. Dykes* (2009) 46 Cal.4th 731, 756-757.)  Aknin does not appear to present any direct claim of evidentiary error or prosecutorial misconduct; instead, he argues his attorney was ineffective because he failed to object.

13

addressed "has personal knowledge that allows him [or her] to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)  For instance, lay opinion testimony regarding the veracity of a statement made by a defendant or other witness "may be appropriate when necessary to clarify a particular line of testimony."  (*Zambrano* at p. 242.)

### a.     Officer Gilbert

After the incident, A.F. traveled to Las Vegas, and on August 26 (four days after the incident) she approached Las Vegas Police Officer Gilbert and asked "for some help to get away from her pimp."

At trial, Gilbert first testified about A.F.'s visible injuries, including her "completely bright red" eyes and dark bruising on her neck and shoulders.  He testified that there were finger marks on her neck, and that, based on experience, he believed the injuries were a few days old.  Gilbert asked A.F. if her pimp had caused the injuries, and at trial the prosecutor asked Gilbert about A.F.'s response:

"Q.     And what if anything did she say?

"A.     She actually discussed quite in length.  I felt she was trying to protect her pimp who was referred to as 'Gorilla' and you know being a cop I wanted to look into it and so I pressed her pretty hard.  I thought that she was trying to protect him.  I watched her and she kept looking out towards the Boulder Highway of the Fremont area and I kind of thought that he was maybe in the area and she was afraid to say anything.  So we talked quite a bit and she convinced me that it was not him and it didn't happen recently.  She told me that it was up here in California—I hope I get this right—she said it was in Redwood City where she was raped and beaten and I pretty much took her word after that because I didn't feel like as if she was lying at all."

Aknin recognizes that the prosecutor did not directly ask Gilbert to opine about A.F.'s veracity, but he argues that defense counsel was ineffective for not moving to strike Gilbert's statement that he did not feel as if A.F. had been lying.  We are not convinced.

14

To begin with, Gilbert's unsolicited comment that he did not feel as if A.F. had been lying was not as much an opinion about whether A.F. was telling the truth as it was a statement of Gilbert's personal view of A.F.'s story (at the time he heard it) to explain why he accepted A.F.'s statement about the injuries. Furthermore, the comment was made in the context of a long answer that was at least partially helpful to Aknin's defense. Gilbert's testimony that he "pressed" A.F. "pretty hard" reinforced the notion that prostitutes protect pimps by not being truthful (suggesting the possibility that A.F. would be untruthful in this case to protect her pimp), and his testimony about A.F.'s injuries reinforced the notion that pimps hurt their prostitutes (suggesting the possibility that A.F.'s injuries were caused or worsened by her pimp).

### b. Officer Bets

Redwood City Police Officer Jesse Bets interviewed A.F. shortly after the incident. At the trial, the prosecutor asked Bets about the interview and asked whether Bets had doubts about A.F.'s statement that she was visiting a friend and had gotten lost while walking around Redwood City at night because she wanted to see the area. Bets doubted A.F.'s explanation and believed she was a prostitute. The prosecutor asked whether Bets also found inconsistent the part of A.F.'s story that she had been thrown to the ground and strangled. Bets responded that he thought that this portion of A.F.'s account might have been true; he testified A.F.'s injuries and emotional state were consistent with someone who had just been attacked.

We do not believe it was objectively unreasonable for defense counsel to have refrained from objecting to these answers. Bets did not just testify that he thought A.F. was truthful; he first testified that he believed she had been untruthful when she told him she was visiting a friend and got lost after exploring the area. This testimony helped Aknin and, after accepting the benefits of it, defense counsel would have been hard pressed to object to the subsequent comment about her perceived truthfulness.

Furthermore, even assuming counsel should have objected to Bets's response that he thought part of A.F.'s story might have been true, Aknin has not shown his failure to do so was prejudicial. Bets already had testified that when he spoke to A.F. she was

15

crying uncontrollably and had fresh abrasions on her shoulder. And the jury heard other testimony and saw other evidence that A.F.'s injuries (including bleeding and bruising inside her eyes, bleeding inside her mouth, and bruising on her neck) were consistent with strangulation. Bets's comment that A.F.'s statement that she was attacked may have been true and was consistent with her injuries and demeanor, added little to this testimony and evidence.

### c. Detective Cirina

David Cirina, the lead Redwood City detective investigating the case, interviewed A.F. at the Keller Center where her sexual-assault examination took place. A.F. was still crying and shaking. After talking for a few minutes to build rapport, Cirina told A.F. he did not believe her story about why she was out that night, and A.F. admitted she had been working as a prostitute. Cirina then conducted an official interview. The prosecutor asked about the interview:

"Q. Can you tell me a little bit about her demeanor and what she was like during the time that you were talking to her in the Keller interview?

"A. She remained upset, seemed to calm down and focus once the interview began and she certainly appeared to be forthcoming and honest from that point on."

The prosecutor's question about A.F.'s demeanor did not ask for Cirina's opinion of her veracity, so it was not objectionable on that ground and could even have elicited favorable testimony, which Aknin appears to concede. The response was less an opinion of A.F.'s truthfulness than a statement of Cirina's personal interpretation of her demeanor. Rather than stating a definitive opinion that A.F.'s account was true, Cirina instead simply stated in the context of describing her demeanor she "appeared to be forthcoming and honest" and answered all his questions.

Even assuming that the unsolicited comment constituted an opinion that Aknin's counsel could have successfully had stricken, Aknin has not shown counsel's failure to move to strike it was prejudicial. Cirina's testimony about A.F. at the Keller Center benefitted the defense in connection with the rape charge because A.F. admitted that she

16

did not know whether she had been sexually assaulted. Her credibility on this point furthered the defense's argument that there was no sexual assault.

### d. Sexual-Assault Examiner Galanter

Victoria Galanter, a sexual-assault examiner, testified that part of the examination procedure is to determine whether the physical findings are consistent with the history provided by a victim. The prosecutor asked her whether the physical evidence was consistent with A.F.'s account in this case.

"Q. Okay. And in this case, after you did your examination and you completed all of the work that you did with [A.F.], did you determine whether or not all the physical findings that you had were consistent with the history she had given you about being strangled?

"A. Yes, it was consistent.

"Q. Was there anything inconsistent in the evidence and her description of what had happened?

"A. No."

Aknin argues that this was inadmissible opinion testimony because Galanter "in effect told the jury she also believed [A.F.'s] account." We disagree. Galanter was not asked to, and did not, opine whether A.F. was credible or was telling the truth. Instead, Galanter, who had personally examined A.F.'s physical injuries, had training and experience examining sexual-assault victims, and was familiar with the types of injuries caused by strangulation, simply stated that the physical injuries she observed were consistent with A.F.'s report of being strangled. Because this testimony was based on Galanter's personal knowledge and could assist the trier of fact in assessing A.F.'s credibility, the trial court would have had discretion to admit it even if counsel had objected. (See *People v. Chatman, supra,* 38 Cal.4th at p. 384 [court may permit witness with personal knowledge to provide "competent testimony that may legitimately assist the trier of fact in resolving credibility questions"]; *People v. Sergill, supra,* 138 Cal.App.3d at p. 40 ["relevant evidence includes evidence that has any tendency in

17

reason to affect the credibility of a witness"]; see also *People v. Zambrano, supra,* 124 Cal.App.4th at p. 242.)

Furthermore, Aknin has not shown Galanter's response was prejudicial. Galanter already had provided testimony, which Aknin does not contend was inadmissible, that A.F.'s injuries were consistent with prolonged strangulation. Accordingly, this response was cumulative. For that reason as well, we do not believe it was objectively unreasonable for defense counsel to have refrained from objecting under these circumstances.

2.      Prior Consistent Statements

Aknin contends his counsel was ineffective because he failed to object on hearsay grounds when prosecution witnesses testified about prior consistent statements by A.F., Griffith, and Beaumont. Aknin argues that introduction of the prior statements "unfairly provided credibility" to A.F. and Griffith.

Hearsay evidence is "evidence of a statement that was made other than by a witness testifying at the hearing and that is offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)); hearsay evidence is inadmissible unless it falls within an exception to the hearsay rule (Evid. Code, §§ 1200, subd. (b), 1201). Aknin argues the statements he now challenges were not admissible under the hearsay exception for prior consistent statements of a witness. Under that exception, a prior consistent statement of a witness is admissible if an express or implied charge has been made that the witness's testimony is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias or improper motive is alleged to have arisen (Evid. Code, §§ 1236, 791, subd. (b)). Aknin claims the statements he challenges were not admissible under this exception because the defense contended A.F. and Griffith had a motive to lie "from the point each participated in the charged incident," and their consistent pretrial statements were not made before this alleged motive arose.

We conclude some of the testimony Aknin challenges was objectionable as inadmissible hearsay, but we also conclude that defense counsel's failure to object to it was not prejudicial.

18

### a. A.F.'s Prior Statements

#### i. Officer Gilbert

As we discussed above, Las Vegas Police Officer Gilbert testified that when A.F. asked him for help to get away from Gorilla, she told him that her visible injuries came from having been beaten and raped in Redwood City by someone other than Gorilla. Aknin argues that defense counsel should have objected to Gilbert's testimony about A.F.'s response because it constituted inadmissible hearsay. A.F.'s response arguably was relevant to the nonhearsay purpose of showing Gilbert's state of mind and subsequent actions, i.e., he did not question A.F. further about whether Gorilla caused her injuries (although he did arrest Gorilla for traffic violations). (See Evid. Code, § 1200, subd. (a); *People v. Hill* (1992) 3 Cal.4th 959, 987 [statements offered to explain hearer's state of mind and conduct are not hearsay], disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; 1 Jefferson, Cal. Evidence Benchbook (4th ed. 2013) § 1.35, p. 26.)

But even assuming counsel could have successfully objected to this testimony on hearsay grounds, Aknin has not shown his failure to do so was prejudicial. A.F.'s statement she wanted to get away from her pimp was potentially helpful to Aknin. It was consistent with his argument that her pimp was violent and could have caused the injuries, a theme Aknin's counsel explored while cross-examining Gilbert. A.F.'s statement she was beaten and raped in Redwood City (rather than later, by Gorilla) also was not likely to be prejudicial because other evidence showed A.F. had significant injuries when she was treated at the Keller Center shortly after her encounter with Aknin. There was no direct evidence that anyone other than Aknin caused the injuries. And, even according to Aknin's own testimony, he grabbed A.F. by the neck, fell with her to the ground, and pushed up on her while still holding her neck.

#### ii. Officers Bets and Unga

As mentioned above, Officer Bets spoke to A.F. shortly after the incident. A.F. told Bets she was grabbed from behind and choked until she lost consciousness, and when she woke up her pants had been removed. A.F. provided Bets with a description of

19

her assailant, which he radioed to other officers. A.F. told Bets she was lost and asked Aknin for directions, that Aknin propositioned her, and that she did not respond to Aknin because she was " 'not that type of girl.' "

Officer Steve Unga testified Bets stated over the radio that a female victim said she had been raped and provided a description of the suspect. While driving toward the scene, Unga saw Aknin (who matched the description) and detained him.

Aknin has not shown his counsel was ineffective for failing to object to this testimony. A.F.'s statements, whether made by her or repeated by Bets, were likely admissible under the spontaneous-statements exception to the hearsay rule. "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240; see *People v. Thomas* (2011) 51 Cal.4th 449, 495.) Bets testified that, when he spoke to A.F. shortly after the attack, she was upset and emotional and was crying uncontrollably, and her injuries were fresh.

Moreover, Aknin has not shown prejudice. Portions of the testimony were helpful to the defense of the rape charge. A.F. told Bets she was choked until she was unconscious, did not remember anything that happened after that, and did not know whether she had been sexually assaulted, points that defense counsel underscored on cross-examination. Bets's testimony about A.F.'s false explanation of why she was in the neighborhood also was helpful to the defense because it weakened A.F.'s credibility, a point defense counsel also pursued during cross-examination.

### iii. Sexual-Assault Examiner Galanter

Galanter testified about A.F.'s answers to questions Galanter asked as part of the sexual-assault examination. A.F. stated she was having her menstrual period, had had sexual contacts in the days prior to the attack, and stated she " 'had a tampon on.' " A.F. told Galanter she got lost and asked for directions; she was grabbed from behind and choked until she passed out; and she did not know what happened after that.

20

Aknin has not shown his counsel was prejudicially ineffective for failing to object to this testimony on hearsay grounds. Portions of Galanter's testimony were helpful to the defense. A.F. did not know what happened after she was choked and lost consciousness, a point defense counsel asked Galanter to reiterate during cross-examination. A.F.'s statement that she got lost and asked for directions (instead of acknowledging she was working as a prostitute) assisted the defense argument that A.F. was not credible, and defense counsel had Galanter repeat that statement during cross-examination as well. And A.F.'s statement she was menstruating was helpful to the defense, specifically the defense argument that the lack of blood on the condom and on Aknin's hands, penis, or scrotum undermined the sexual-assault charges.

iv.    Witness Beaumont

The prosecutor asked Beaumont whether A.F. had said anything about knowing or working with Griffith, and Beaumont answered "no." Aknin contends his counsel should have objected on hearsay grounds. Counsel was not deficient. " 'Hearsay evidence' is evidence *of a statement that was made* other than by a witness testifying at the hearing and that is offered to prove the truth of *the matter stated*." (Evid. Code, § 1200, subd. (a), italics added; *People v. Zamudio* (2008) 43 Cal.4th 327, 350 (*Zamudio*).) Aknin appears to suggest that A.F.'s failure to say anything about whether she knew or was working with Griffith—i.e., her silence about these matters—constitutes "a statement that was made" for purposes of the hearsay rule. (Evid. Code, § 1200, subd. (a).) But "nonverbal conduct," such as a person's silence, constitutes a " 'statement' " under the hearsay rule only if it was "intended by [the person] as a substitute for oral or written expression." (*Id.*, § 225; *Zamudio* at p. 350.) Because nothing suggests A.F. intended her failure to say anything about whether she knew or was working with Griffith to be "a substitute for oral or written verbal expression" (Evid. Code, § 225), Aknin's counsel was not deficient for failing to object to Beaumont's testimony on hearsay grounds. (See *Zamudio* at p. 350; cf. *People v. Snow* (1987) 44 Cal.3d 216, 227 ["nonassertive responses or reactions," such as defendant's lack of reaction upon hearing news of victim's death, are not hearsay].)

Aknin also challenges the following portion of Beaumont's testimony:

"Q. . . . And during the time that you were waiting for the police to get there, what was [A.F.] doing?

"A. She was sitting there and just talking and she said that 'This guy raped me. I tried to call for help.' "

The prosecutor's question did not call for hearsay and therefore was not objectionable on that ground. And defense counsel was not deficient for failing to move to strike Beaumont's answer. A.F.'s statement to Beaumont (made shortly after the attack) likely was admissible as a spontaneous statement. (See Evid. Code, § 1240.) Aknin also has not shown prejudice. The jury probably did not give significant weight to Beaumont's testimony that A.F. told him she was raped because the jury had already heard testimony from A.F. and from Galanter that A.F. did not know what happened while she was unconscious.

### v. Detective Cirina

Detective Cirina testified about his interview with A.F. and stated that A.F. told him she used Aknin's cellular phone to call Gorilla for assistance in getting away from Aknin. Aknin has not shown this testimony was prejudicial. Portions of the account A.F. gave to Cirina were potentially helpful to the defense. On cross-examination, defense counsel asked Cirina to repeat a number of A.F.'s statements, emphasizing such points as A.F.'s reluctance to admit she was engaged in prostitution and the fact she did not tell Cirina she knew she had been raped.

### b. *Griffith's Out-of-Court Statements*

### i. Witness Frisby

Linda Frisby, a longtime friend of Griffith, testified about a telephone conversation she had with Griffith after he had chased and caught up with Aknin. Aknin argues that her testimony included inadmissible hearsay. We conclude that Aknin has not shown his counsel was ineffective for failing to object to this testimony.

First, Aknin contends Frisby testified that Griffith said he never left California. The cited testimony is as follows:

22

"Q.    Did he ever tell you that he'd been out of California?

"A.    No.  He couldn't go out of California because he had to wear an anklet.

"Q.    And was he—

"A.    That was the reason why we had to get permission all the time for him to go to Santa Rosa or even to go to Hayward because of the anklet.

"Q.    Okay.  So he never described for you having gone to Las Vegas?

"A.    No.

"Q.    Never been to Las Vegas?

"A.    No."

Frisby thus responded that Griffith had *not* told her about leaving California or about going to Las Vegas.  Aknin's counsel was not deficient for failing to object on hearsay grounds because Frisby did not relate a "statement that was made" for purposes of the hearsay rule.  (Evid. Code, §§ 1200, subd. (a), 225; see *Zamudio, supra,* 43 Cal.4th at p. 350; cf. *People v. Snow, supra,* 44 Cal.3d at p. 227.)  As for Frisby's statement about Griffith's ankle device, even if construed as relating statements by Griffith, Aknin has not shown prejudice.  The statement was potentially helpful to the defense (because it underscored that Griffith was a parolee) and, in any event, was peripheral to the central issues in the case.

Second, Aknin argues Frisby testified Griffith told her the gorilla tattoo on his back was to remind him of his heroin addiction, rather than because he was a pimp.  The prosecutor questioned Frisby as follows:

"Q.    Did you ever know him to be known by the nickname of Gorilla?

"A.    No.

"Q.    Okay.  Ever hear that?

"A.    No.

"Q.    Now, do you know he has a—

"A.    Yes, I do.

"Q.    —tattoo on his back?

"A.    Yes, I do.

23

"Q.    Okay.  And has he ever explained to you what the meaning of that tattoo is?

"A.    Yes.

"Q.    What did he tell you?

"A.    It was to remind him of the heroin addiction.

"Q.    Okay.  The monkey on his back?

"A.    The monkey on the back."

Aknin has not shown prejudice.  The most important point for the defense was that Griffith, for whatever reason, had a gorilla tattoo on his back, thus permitting the defense to argue he was A.F.'s pimp, Gorilla.  Whether Griffith had the tattoo on his back because of his heroin addiction or for some other reason was incidental.

Third, Aknin refers to Frisby's testimony that, after the incident, Griffith called her and asked whether he had done the right thing by chasing Aknin.  Most of this testimony (i.e., Griffith's questions to Frisby whether he had done the right thing) was not objectionable as hearsay because it was not offered to prove the truth of the matter stated.  (See Evid. Code, § 1200, subd. (a).)  As for Griffith's statement he had chased a man he believed had committed a rape, that was undisputed, so Frisby's testimony to that effect was not prejudicial.

Fourth, Aknin notes Frisby's testimony that Griffith told her he did not know A.F. before the night of the incident.  The prosecutor questioned Frisby as follows:

"Q.    Did Eddie ever tell you that he knew the woman before—whether or not he knew the woman before he had seen her at the 7-Eleven?

"A.    No, he never knew her.

"Q.    He told you he did not know her?

"A.    He told me he didn't know her."

Defense counsel may have been able to object successfully to this testimony on hearsay grounds, as the prosecutor asked Frisby to recount, and Frisby did recount, Griffith's statement.  The response also could have had some prejudicial impact because it bolstered Griffith's testimony that he had not met A.F. before seeing her in the 7-Eleven store.  But, assuming the response was potentially prejudicial to Aknin, we

24

conclude later in this opinion that Aknin has not shown a reasonable probability that, but for counsel's alleged errors in not objecting to this and other items of evidence, the result of the trial would have been different. (See *Strickland, supra,* 466 U.S. at pp. 687-688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

Fifth, Aknin contends Frisby testified that Griffith said he was not involved in prostitution. The exchange was as follows:

"Q. Okay. Have you ever known Eddie to be involved in any kind of prostitution?

"A. No.

"Q. Has he ever told you anything about being involved in any prostitution?

"A. No."

Aknin's counsel was not deficient for failing to object on hearsay grounds because Frisby did not relate a "statement that was made" for purposes of the hearsay rule. (Evid. Code, §§ 1200, subd. (a), 225; see *Zamudio, supra,* 43 Cal.4th at p. 350; cf. *People v. Snow, supra,* 44 Cal.3d at p. 227.)

ii.    Detective O'Gorman

Redwood City Police Detective Joseph O'Gorman spoke to Griffith at the scene, after Griffith had chased Aknin and was detained by police. O'Gorman also testified Griffith was still "out of breath" and "excited." O'Gorman testified Griffith told him he heard a commotion, went out of his room, and saw a man moving on the ground; the man got up and ran; Griffith saw a woman on the ground; and Griffith chased the man. Aknin has not shown his counsel was prejudicially ineffective for failing to object to this testimony. Some or all of Griffith's statements to O'Gorman were likely admissible as spontaneous statements. (See Evid. Code, § 1240.)

Moreover, Aknin has not shown O'Gorman's testimony was prejudicial. The testimony supported the defense position that Griffith provided shifting and incomplete accounts of the incident. O'Gorman testified Griffith did not say he had threatened to shoot Aknin while he chased him; instead, Griffith claimed Aknin had threatened to shoot him. (At trial, Griffith testified that, although he did not have a gun, he yelled that he had

25

one and threatened to shoot Aknin if he did not stop.) Griffith initially told O'Gorman he had never seen the woman he believed had been raped; he then changed his story to say he might have seen her in the 7-Eleven store. Defense counsel explored these points on cross-examination.

### iii. Parole Officer Babb

Griffith's parole officer, Mark Babb, testified that Griffith never discussed Las Vegas or requested permission to go there. Aknin's counsel was not deficient for failing to object on hearsay grounds because Babb did not relate a "statement that was made" for purposes of the hearsay rule. (See Evid. Code, §§ 1200, subd. (a), 225; *Zamudio, supra,* 43 Cal.4th at p. 350; cf. *People v. Snow, supra,* 44 Cal.3d at p. 227.)

Griffith met with Babb on August 22, 2008. The prosecutor asked whether Griffith told Babb "about the event that had happened the evening before[.]" Babb replied that Griffith had done so and described his demeanor as emotional and somber. The testimony was not hearsay because Babb did not recount Griffith's statements.

### iv. Witness Beaumont

In response to the prosecutor's questions, Beaumont testified Griffith did not say he knew A.F. or Aknin before the incident, Griffith did not say he had lived in Las Vegas, and A.F. did not say she knew Griffith or was working with him. Aknin's counsel was not deficient for failing to object on hearsay grounds because Beaumont did not relate a "statement that was made" for purposes of the hearsay rule. (See Evid. Code, §§ 1200, subd. (a), 225; *Zamudio, supra,* 43 Cal.4th at p. 350; cf. *People v. Snow, supra,* 44 Cal.3d at p. 227.)

### v. Witness Griffith

Aknin contends Griffith testified about his own prior hearsay statements. Griffith testified that, when he was detained by the police, he answered all their questions, told them about his parole status, and told them about the events to which he had testified at trial, except he did not tell them he had threatened Aknin while chasing him. The prosecutor then questioned Griffith about why he had not told the police about his threat. Aknin has not shown this testimony was prejudicial. The testimony was phrased in

26

general terms (i.e., Griffith did not repeat his account of chasing Aknin). Moreover, testimony about what Griffith did and did not tell the police was potentially helpful to the defense because it highlighted Griffith's failure to admit he had threatened Aknin.

### c. Beaumont's Out-of-Court Statements

Redwood City Police Officer Walter Montti testified about his interview of Beaumont at the scene of the incident. Beaumont stated he and Griffith went outside to buy cigarettes; a white male with a ponytail ran by; Griffith yelled, " 'Hey, you rapist,' " and began chasing the man; a woman called for help; the woman's face was bloody, and she was nude from the waist down; Beaumont gave her a pair of pants; and the woman said the man with the ponytail had choked her.

Aknin has not shown his counsel's failure to object to this testimony was prejudicial. Beaumont's testimony and statements were largely cumulative of other testimony in the case. Further, the inconsistency between Beaumont's statements to Montti (reporting only that A.F. said she was choked) and Beaumont's trial testimony (that A.F. said she was raped) potentially weakened Beaumont's reliability as a witness and thus assisted the defense. In closing argument, defense counsel argued Beaumont was an unreliable witness whose story changed over time.

### 3. Allegedly Improper Testimony by Detective Cirina

Aknin contends his counsel was ineffective because he failed to object when the prosecutor elicited inadmissible testimony, including hearsay and opinion testimony, from Cirina. We disagree. Some of the testimony Aknin challenges was admissible. And, assuming counsel should have objected to some of the testimony, his failure to do so was not prejudicial.

### a. The Sexual-Assault Examination

Aknin contends that Cirina improperly opined or speculated that A.F. did not have a tampon inserted when she was examined at the Keller Center. This is incorrect. In the passage Aknin cites, Cirina did not give his opinion. Instead, he referred to the trial testimony of Galanter, the sexual-assault examiner, that A.F. stated she had a tampon inserted (and therefore Galanter wrote that on the form), but when Galanter conducted the

27

physical examination, A.F. did not have a tampon inserted. ("Q. . . . Explain to us what that confusion was [about whether A.F. had a tampon inserted]. [¶] A. As Victoria Galanter testified to, she noted in her report that [A.F.] had a tampon on. When the exam began, she did not have a tampon in.")[10]

Aknin also contends his counsel should have objected to Cirina's testimony that, during his later telephone conversations with A.F. about the tampon, she seemed confused and did not have a clear recollection on that issue. Although the court sustained defense counsel's objection to a question whether Cirina believed A.F. was "guessing," Aknin has not shown his counsel was deficient for failing to object to other questions that were more closely tied to Cirina's observations of A.F.'s demeanor, such as questions whether A.F. "seem[ed] certain" or "seem[ed] confused." In any event, Aknin has not shown prejudice, as evidence of A.F.'s confusion about the tampon was potentially helpful to the defense. Moreover, A.F.'s used tampon, which was found at the scene, showed she was menstruating, while the forensic tests from the condom and the swabs of Aknin's genitals lacked any indication of blood, assisting Aknin's argument that he had not raped A.F.

### b. Detective Cirina's Telephone Call with Gorilla

Both Aknin and A.F. testified that A.F. had used Aknin's cellular phone outside the 7-Eleven store. A.F. said the number she had called on Aknin's cellular phone belonged to Gorilla. During his direct examination at the trial, Cirina testified that he called this number. Based on the voice of the man who answered, Cirina was sure the man was not Griffith.

Aknin's counsel cross-examined Cirina about whether he had followed up on leads supporting the defense theory that Griffith was Gorilla or was working with A.F.

On redirect, the prosecutor elicited Cirina's explanation why he had or had not followed certain leads identified by defense counsel. As part of that examination, the

---

[10] In his reply brief, Aknin argues the testimony was hearsay. Aknin forfeited this argument by failing to raise it in his opening brief. (See *People v. Alexander* (2010) 49 Cal.4th 846, 922.)

28

prosecutor addressed the call to Gorilla and asked: "And [the person who answered] gave you no indication that he wasn't 'Gorilla,' correct?" Cirina responded: "He said he was 'Gorilla.' " The prosecutor asked: "You had no reason to believe that that person you were speaking with was not the person that [A.F.] had told you about?" Cirina answered: "No, no reason whatsoever."

Aknin contends his counsel should have objected to Cirina's testimony because it violated a pretrial ruling and included hearsay statements by Gorilla and improper opinion testimony by Cirina.[11]

The pretrial ruling does not establish counsel was ineffective. The pretrial ruling was entered after Aknin filed a motion in limine to exclude hearsay testimony about the call. In the motion, Aknin described a number of statements, set forth in Cirina's police report, that the person who answered (Gorilla or Mike) made during the call.[12] Aknin argued in the motion that "[t]he statements contained in Detective Cirina's police report as summarized above are clearly hearsay," and he requested an order "precluding any hearsay testimony from Detective Cirina regarding alleged conversations with 'Mike' A.K.A. 'Gorilla.' " At a hearing on the motions in limine, the court stated it would "preclude Detective Cirina from making any statements regarding a conversation between himself and Mike or Gorilla. . . . [u]ntil some theory that would demonstrate either non-hearsay or exception to the hearsay rules becomes clear. And then we will do that outside the presence of the jury."

---

[11] In his reply brief, Aknin suggests the testimony was improper because it included *A.F.'s* hearsay statement as to which telephone number was Gorilla's. We decline to address this argument, which Aknin did not raise in his opening brief. (See *People v. Alexander, supra,* 49 Cal.4th at p. 922.)

[12] According to the motion, Gorilla told Cirina he was in Redwood City on the night of the incident and received a telephone call from A.F. just after midnight. He heard an aggravated male voice in the background say something like " 'Come on!' " When Gorilla saw A.F. the next day, she had visible choke marks on her neck, which she said were the result of being choked until she " 'blacked out.' " A.F. told Gorilla that, when she woke up, her clothes were gone.

29

Although the court phrased its oral ruling broadly, it appears the parties understood the ruling not as precluding *any* testimony about the call but as precluding evidence of statements allegedly made by Gorilla during the call (which were the focus of Aknin's motion). At trial, the prosecutor confirmed Cirina was not to discuss the substance of the conversation. ("Q. Okay. You're not allowed to talk about what specifically was engaged in that conversation, correct? [¶] A. Right.") Defense counsel's failure to object on the ground that Cirina's testimony violated the court's ruling suggests he shared the prosecutor's understanding of the scope of the ruling, which was reasonable in light of the motion's focus on Gorilla's alleged statements. Defense counsel was not deficient for failing to object to all testimony about the call on the ground it violated the pretrial ruling.

Aknin's counsel also was not deficient for failing to object to Cirina's opinion that, based on the voice of the person who answered, he was sure the person was not Griffith. As noted, a lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; *People v. Farnam, supra,* 28 Cal.4th at p. 153.) Cirina's opinion was based on his perception—he had spoken with the person who answered the telephone, and he had spoken with Griffith. Cirina's opinion also was helpful to a clear understanding of his testimony about such matters as his efforts to locate Gorilla and the calls between Aknin's telephone and Gorilla's number.

We acknowledge Cirina's testimony that the person on the telephone "said he was 'Gorilla' " may have been hearsay or improper under the court's pretrial ruling. The prosecutor's question (i.e., whether the person who answered "gave you no indication that he wasn't 'Gorilla,' correct?") did not expressly call for hearsay, so counsel was not deficient for failing to object on that ground. Assuming counsel should have moved to strike Cirina's response, his failure to do so could have had some prejudicial impact. As the Attorney General notes, the prosecutor did not follow up by asking Cirina to relate the substance of the conversation, and she later reminded him he was not to do so. But, as Aknin points out, the prosecutor emphasized this testimony in closing argument, stating:

30

"[Detective] Cirina talked to him on the phone, and he admitted that he was 'Gorilla.' "
Assuming this response was potentially prejudicial to Aknin, we conclude later in this
opinion that Aknin has not shown a reasonable probability that, but for counsel's alleged
errors in not objecting to this and other items of evidence, the result of the trial would
have been different. (See *Strickland, supra,* 466 U.S. at pp. 687-688, 694; *Carter, supra,*
30 Cal.4th at p. 1211.)

Finally, counsel was not deficient for failing to object to Cirina's testimony that
(1) he had no reason to believe the person on the telephone was not A.F.'s pimp, and
(2) nothing he learned in his investigation, including on the call in question, led him to
believe Griffith was the pimp or was working with A.F. This testimony did not recount
statements by Gorilla, so counsel was not deficient for failing to object on hearsay
grounds or on the basis that the testimony violated the pretrial ruling. This evidence also
was not improper opinion testimony. Cirina testified on these points during redirect
examination, after Aknin's counsel had cross-examined Cirina about the adequacy of his
investigation. To the extent Cirina stated opinions, he was explaining the views he held
at different points in the investigation, which were relevant to why he did or did not
pursue certain leads. Such opinions were based on Cirina's perception and were helpful
to a clear understanding of his testimony.[13] (See Evid. Code, § 800.)

### c. *A.F.'s Injuries*

Aknin contends Cirina's testimony included hearsay and improper opinions about
the source of A.F.'s injuries. We disagree.

During recross-examination, defense counsel, continuing his inquiry into the
adequacy of the police investigation, asked Cirina if he had considered whether A.F.'s
pimp Gorilla, rather than Aknin, might have caused A.F.'s injuries. Counsel elicited that

---

[13] Aknin suggests the prosecutor introduced her own hearsay statements when she
asked if Cirina "[t]ook every effort [to find Gorilla] as I was yelling at you on the phone
to 'find him, find him, find him,' right?" (Cirina answered: "Yes, ma'am.") Aknin has
not shown prejudice. In light of the admissible evidence about Cirina's search for Gorilla
(discussed in the text), the addition of the challenged statements (i.e., the prosecutor 's
direction to Cirina to find Gorilla) was not prejudicial.

Cirina was "aware" that pimps often physically abuse prostitutes and that prostitutes often protect their pimps from law enforcement. Defense counsel also asked: "So *did it ever occur to you* that [A.F.'s] injuries could have been caused by 'Gorilla' also known as Mike Smith, either before or after the encounter with Mr. Aknin?" (Italics added.) Counsel also asked: "*It didn't occur to you*, though, that when [A.F.] went back to Las Vegas, she may have been harmed by Mike Smith, also known as 'Gorilla'?" (Italics added.) Cirina answered that, when he interviewed A.F. shortly after the incident, her injuries were fresh; when he dropped her off at her motel several hours after photographs of her injuries were taken, the injuries already looked worse than in the photographs; and, based on his training and experience, such injuries worsen over time, which he believed explained the more extensive visible injuries observed by Officer Gilbert several days later.

On re-redirect examination, the prosecutor followed up on this line of questioning by asking Cirina whether, at the time he first interviewed A.F., he had any reason to believe Gorilla had harmed her. ("Q. . . . And did you have any reason to believe on the evening that you were interviewing [A.F.] that 'Gorilla' had done anything to her? [¶] A. No. [¶] Q. Okay. And she never said anything about that? [¶] A. Nope.") Cirina thus testified about his state of mind during the investigation (a subject defense counsel had explored); Aknin is incorrect in suggesting Cirina was stating his opinion at the time of trial. Even if Cirina's response can be characterized as including an opinion (i.e., the opinion he held at a certain point in the investigation), that opinion was based on Cirina's perception and was helpful to a clear understanding of his testimony about the adequacy of the investigation. (See Evid. Code, § 800.)

As to hearsay, the prosecutor asked if A.F. had ever said anything about Gorilla having harmed her, and Cirina answered that she had not. Aknin's counsel was not deficient for failing to object to those responses on hearsay grounds because Cirina did not relate a "statement that was made" for purposes of the hearsay rule. (See Evid. Code, §§ 1200, subd. (a), 225; *Zamudio, supra,* 43 Cal.4th at p. 350; cf. *People v. Snow, supra,* 44 Cal.3d at p. 227.) In other responses, Cirina did relate A.F.'s statements, saying

"[A.F.] said she was afraid of [Gorilla], but, yet, he had never hit her." But this testimony had a nonhearsay purpose—A.F.'s statement that Gorilla had never hit her, regardless of its truth, was relevant because it explained Cirina's investigative decisions and conclusions (such as why it did or did not "occur[]" to Cirina that Gorilla had caused A.F.'s injuries).

### d. Consistency of Statements

Defense counsel cross-examined Cirina about why he did not investigate whether Griffith was A.F.'s pimp or was working with A.F. On redirect, the prosecutor referred to this line of cross-examination, and asked whether Cirina, at the time he arrested Aknin, had "any doubt in your mind that [Griffith] was not the pimp?" Cirina responded: "I had no doubt in my mind [Griffith] was not the pimp." Cirina testified his telephone conversation with Gorilla strengthened his opinion Griffith was not the pimp. The prosecutor asked: "Did that person [i.e., Gorilla] have anything—was there anything inconsistent with what [A.F.] had told you?" Cirina responded: "Everything [A.F.], the real 'Gorilla' and Eddie Griffith said were consistent with each other with 'Gorilla' being the pimp and [Griffith] and [A.F.] not having met before that evening."

Aknin contends this response was improper opinion testimony. We disagree. Cirina's opinion that the statements of three people with whom he had spoken were consistent on this point was based on his perception and was helpful to a clear understanding of his testimony about his investigation (a topic raised by the defense). (See Evid. Code, § 800.)

### e. Alleged Conspiracy to Rob Aknin

On redirect, the prosecutor followed up on defense counsel's cross-examination of Cirina about the adequacy of the investigation. The prosecutor asked: "And there was nothing that you learned during your investigation that led you to believe that [Griffith] might be involved with [A.F.] or somehow had robbed [Aknin]?" Cirina replied: "Things I learned during my investigation discounted that." The prosecutor later asked: "Did [Griffith's] history as an armed robber and a rapist in any way change your opinion that he was not involved in this incident as anything other than a good Samaritan?"

33

Answer: "No." The prosecutor elicited from Cirina that, in some cases involving alleged sexual assaults, he has determined there was insufficient evidence to arrest or charge anyone; in this case, he believed arresting Aknin was appropriate based on the evidence he had, and nothing in his investigation changed his opinion about what had happened.

Aknin contends these responses included improper opinion testimony. We disagree. The defense, by cross-examining Cirina about the adequacy of his investigation, opened the door to redirect examination on those matters. To the extent the above responses included Cirina's description of the opinions he held at certain points during the investigation, those opinions were based on his perception and were helpful to a clear understanding of his testimony about the investigation. (See Evid. Code, § 800.) Moreover, Aknin has not shown this testimony was prejudicial. Defense counsel followed up by cross-examining Cirina again about leads he had not pursued.

### f.      *Beaumont's Credibility*

Aknin contends Cirina improperly opined about Beaumont's credibility. The prosecutor asked Cirina about his interview with Beaumont. "During the time that you spoke to him, what was his demeanor and his persona like?" Cirina responded: "I've had a lot of experience with people like Colin where they're just chronic drug users. Colin is like—the best I could describe him, he's very impulsive. I don't think he can think out more than ten, maybe twenty minutes down the road unless he's focusing on getting high; he cannot focus. So Colin's demeanor has always been—two or three contacts I've had with him, confused, perplexed, uninterested, not very focused, not able to recall with much clarity." In closing argument, the prosecutor argued some things Beaumont said (such as that Griffith was from Las Vegas) were not true, but there was nothing inconsistent about Beaumont's basic story that he saw A.F. outside his motel room and helped her.

Aknin has not shown this testimony was inadmissible or defense counsel was ineffective for failing to object to it. The prosecutor asked about Beaumont's demeanor, and Cirina's answer focused on Beaumont's demeanor and manner during Cirina's contacts with him.

34

Moreover, any suggestion by Cirina or the prosecutor that Beaumont was not a reliable witness on all issues could not have been prejudicial because the defense took the same position. Defense counsel asked Cirina: "Now, Mr. Beaumont, obviously, he's got some mental impairment [as a result of long-term drug use], would you agree?" Cirina responded: "I'm not a medical doctor, but I would agree with you, yes." In closing argument, defense counsel stated: "I think I can speak fairly when I say [the prosecutor] and I thought Colin Beaumont would be a main and important witness, but as it turns out, as we witnessed [during Beaumont's trial testimony], his brain is just a bit too fried to be reliable." Defense counsel noted many parts of Beaumont's story had changed over time; counsel argued, however, that Beaumont had consistently said Griffith's street name was Gorilla. Both parties thus argued Beaumont was unreliable on many issues, but was credible on certain key issues. Aknin has shown no prejudice from Cirina's testimony on this point.

4.     Closing Argument

Aknin contends his counsel was prejudicially ineffective for failing to object to prosecutorial misconduct during closing argument. " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.] '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) A defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached if the misconduct had not occurred. (*People v. Crew* (2003)

31 Cal.4th 822, 839.) We conclude some of the prosecutor's statements that Aknin identifies were not improper, and the others were not sufficiently prejudicial.

### a.     Comment on Aknin's Explanation of A.F.'s Injuries

The prosecutor argued Aknin's explanation for A.F.'s injuries (i.e., she threatened to rob him, and, as he attempted to flee, he grabbed her neck and fell on top of her) was implausible. The prosecutor contended a person who fell would put his or her arms out and then push up (rather than holding on to another person's neck while falling and while pushing up). The prosecutor also argued Aknin's claim that the injuries resulted from his falling on A.F. and holding her neck for 10 to 15 seconds was implausible because the medical evidence showed that, in light of her strangulation injuries, Aknin must have held her throat for at least 50 seconds. As part of this argument, the prosecutor stated Aknin's explanation of how he fell was "the most contrived testimony I have ever heard to explain the most obvious and apparent strangulation injuries I have ever seen in my life."

Aknin contends the prosecutor, by making this statement, improperly urged the jury to decide the case based on facts not in evidence and the prosecutor's experience in other cases. We conclude it is not reasonably likely the jury construed the prosecutor's remark in that fashion. (See *People v. Smithey, supra,* 20 Cal.4th at p. 960.) The statement was, at most, fleeting hyperbole in the midst of the prosecutor's argument that Aknin's account was implausible in light of the evidence and common sense. The jury reasonably would have understood the prosecutor's argument in that manner, not as an entreaty to decide the issue based on the prosecutor's experience in other cases. (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [holding "not inappropriate," prosecutor's statement " 'that's the best case I've ever seen in any case I've ever prosecuted of intentional misrepresentation and consciousness of guilt.' "], revd. on other grounds (*Stansbury v. California* (1994) 511 U.S. 318, 327); *People v. Rich* (1988) 45

36

Cal.3d 1036, 1092 ["fair" comment on the evidence where prosecutor argued " 'I have never seen deliberation and premeditation like that' "].)[14]

### b. Comment on Whether Aknin Attacked A.F.

The prosecutor stated the biggest issue for the jury would be whether Aknin was guilty of rape (count 1). In making this argument, the prosecutor stated: "Now, here's where, ladies and gentlemen, I find the bottom of the issue is going to result. I have no doubt in my mind—I certainly hope that there is going to be no doubt that [Aknin] pushed [A.F.] into that alley, choked her to unconsciousness and then something happened before [Griffith] came out. What happened is what's going to be at issue here. And you will—I'll tell you about the elements in a minute. I don't think you're gonna have any problem finding it was an assault with intent to commit rape [count 2]. I don't think that you'll have any problem finding that it was an assault with force likely to cause great bodily injury [count 3]. And I don't think there will be any problem with Count 4, finding that she was battered and serious bodily injury occurred. [¶] I think the issue is going to lie in Count 1, did he or did he not rape her?"

Aknin argues that the prosecutor, by stating " 'I have no doubt in my mind,' " improperly expressed her personal opinion Aknin was guilty and suggested there was additional evidence beyond what the jurors heard. In view of the entire context in which these statements were made, it is not reasonably likely the jury understood them in this manner. (See *People v. Smithey, supra,* 20 Cal.4th at p. 960.) The prosecutor was referring to the evidence, rather than arguing her personal belief based on matters outside the record. She argued overwhelming evidence supported conviction on counts 2 through 4, after which she argued in detail about the evidence supporting the rape charge in

---

[14] In *People v. Medina* (1995) 11 Cal.4th 694, 758, cited by Aknin, the prosecutor argued " 'no case I have ever seen' " had such overwhelming evidence, and the Attorney General conceded the comment was objectionable. The Supreme Court held, however, that given the strong evidence of guilt, it was not likely the comment unduly influenced the jury. (*Medina* at p. 758.) Similarly, here, in light of the medical evidence as to the sustained pressure needed to inflict strangulation injuries like those suffered by A.F., it is not likely the jury was unduly influenced by the prosecutor's statement.

count 1. Even within the specific remark challenged by Aknin, the prosecutor shifted from stating her own view ("I have no doubt in my mind"), to expressing her hope that *the jury* would have no doubt what the evidence showed. Aknin has not shown prejudicial misconduct.

### c. Comment on Credibility of Witnesses

Aknin contends the prosecutor improperly vouched for the credibility of prosecution witnesses when she stated: "All I can tell you, ladies and gentlemen, is Eddie [Griffith] and [A.F.] and Colin [Beaumont] came in here and did the best they could to tell you the truth." In light of the context in which the prosecutor made this statement, we conclude it was not prejudicial.

The prosecutor acknowledged there were discrepancies in the evidence and stated defense counsel would point out inconsistencies among witnesses' statements. The prosecutor urged the jury to look at "the big picture," and to consider whether the inconsistencies were important or were just caused by differences in how people perceive and recall events. She also noted the trial court would instruct the jury on factors to consider in assessing credibility. The prosecutor then stated Griffith, A.F., and Beaumont did their best to tell the truth, while acknowledging that some of the things Beaumont said were not true, and that all three witnesses had admitted being untruthful on certain issues. The prosecutor discussed the evidence at length, and argued the jury should consider how reasonable a witness's testimony is in light of other evidence in the case.

The jury reasonably would have understood the prosecutor's statement that A.F. and Griffith did their best to tell the truth as a part of her argument that the jury should focus not on minor discrepancies in the evidence, but on whether the witnesses' testimonies were reasonable in light of the other evidence. The jury would not reasonably have understood the prosecutor's statement as an assertion that she knew, based on facts outside the record, that the witnesses were telling the truth. The statement was not prejudicial.

### d. *Discussion of Rape at Scene of Incident*

Aknin testified the ambulance attendant who transported him to the hospital threatened to put surgical tubing down his nose if he did not confess what he had done. On cross-examination, Aknin suggested the attendant, William McClurg, might have reacted that way because the police had told him Aknin was a rapist. In closing argument, the prosecutor argued this portion of Aknin's account was not credible because there was no plausible reason that McClurg (an independent witness unaffiliated with law enforcement, who testified he asked Aknin for basic information such as his name and medical history) would take such actions or lie in court. As part of this argument, the prosecutor stated: "There is no doubt that William McClurg, the guy who is now a supervisor of paramedics, who has no connection whatsoever to lie in court, who basically told you he, you know, was a medic and then a paramedic and then a paramedic supervisor. He's going to hear that this is a rape suspect—first of all, nobody at the scene was talking about a rape. Remember that. The defendant was loaded into the ambulance before any statements were being taken, before anybody knew what was going on exactly. He might have heard something over the dispatch, but the fact is nobody was saying, 'Oh, he's a rapist. He's a rapist,' or anything like that. It was all just—remember Eddie [Griffith] said it was crazy and chaotic, they made him sit down for 20 or 30, maybe, then, 40 minutes before they interviewed him because they were trying to stabilize the situation."

Aknin argues the prosecutor's statement that there was no discussion of rape at the scene was improper because the prosecutor knew it was false. The evidence Aknin cites does not support this assertion. Aknin cites pretrial hearing testimony showing that some police officers knew or believed Aknin was suspected of sexual assault. Officer Angela Wittman testified about what she knew when she arrived at the scene: "I believe—well, there was a call that came out at the Garden Motel, a possible rape had occurred and they gave a description of one of the suspects and that there was another male following him on foot." Officer Walter Montti testified he responded to the Garden Motel because of a report of a sexual assault. Montti also testified that the reason he stayed with Aknin at

39

the hospital (after following the ambulance there) was because Aknin was in custody for sexual assault.

Aknin cites no evidence showing any officer accused Aknin of rape in McClurg's presence or told McClurg that Aknin was suspected of rape, or showing officers discussed an alleged rape at the scene. We also note the prosecutor qualified her statement by acknowledging that McClurg, like the officers, "might have heard something over the dispatch" about an alleged sexual assault. Aknin has not shown the prosecutor knowingly made a false statement.

### e. Comment on Efforts to Locate Gorilla

Aknin contends the prosecutor improperly made herself a "witness" during closing argument by describing the efforts to locate A.F.'s pimp, Gorilla. Aknin has not shown prejudicial misconduct.

First, the prosecutor's statements were based on the evidence. Cirina testified about his efforts to find Gorilla. Cirina testified that, before he read Beaumont's interview statements saying Griffith was from Las Vegas, he did not know the defense theory would be that Griffith was Gorilla. The prosecutor's comments in closing argument echoed these points. The prosecutor stated that, before the prosecution received Beaumont's statements, "it never dawned on us in a million years that somebody was going to try to play [Griffith] off as 'Gorilla' and there was gonna be this big story about a conspiracy and a robbery and him being her pimp and all of that." For that reason, some facts that turned out to be important did not initially appear relevant. ("That explains, ladies and gentlemen, why some of the details that we eventually found to be necessary and relevant, we didn't see in the beginning.")

Second, Aknin is incorrect in asserting that it was improper for the prosecutor to present any testimony or argument about the investigation. Defense counsel suggested that police had conducted an inadequate investigation and had failed to follow up on leads that would have supported the defense, such as further investigating whether Griffith was Gorilla or was working with A.F., and whether Gorilla, rather than Aknin, might have caused A.F.'s injuries. The cross-examination focused in part on Cirina's

40

state of mind during the investigation (e.g., defense counsel questioned Cirina about whether certain scenarios had "occur[red]" to him). For this reason, Cirina's testimony about what he knew and thought at different points during the investigation was admissible because it was relevant to why he did or did not follow up on leads. The prosecutor's arguments on this point were based on the evidence and were proper.

### f. Summary of Testimony About Call with Gorilla

The prosecutor argued Griffith was not Gorilla. As part of this argument, she referred briefly to Cirina's testimony about his call to the number A.F. said belonged to Gorilla. The prosecutor stated: "Detective Cirina didn't just get the number and get the records, he actually called the number. He told you he placed the call. He spoke to a person. The person had an African-American voice and the person did not give him any details that were inconsistent with what [A.F.] told him."

Aknin contends these statements by the prosecutor about the call violated the pretrial ruling on that issue. As we discussed above, although the court phrased its oral pretrial ruling broadly, the record suggests the parties reasonably understood the order not as precluding any reference to the call, but only as barring repetition of the statements allegedly made by Gorilla on the call. In the portion of the argument challenged by Aknin, the prosecutor did not repeat Gorilla's alleged statements during the call. She just noted Cirina's testimony that he made the call, his description of the voice of the person who answered, and his statement that the person gave no details inconsistent with what A.F. had told Cirina.

### g. Comment that Police Officers Would Not Lie

The prosecutor argued the police did not intentionally ignore evidence, and she discussed Aknin's testimony that he did not report the alleged crimes against him because everyone at the scene was against him. In the context of this argument, the prosecutor stated the officers had no reason to lie, their "entire livelihoods are wrapped up in their credibility," they risked prosecution for perjury if they lied, and the jury had no reason to disbelieve their testimonies. The prosecutor stated that, if she asked a police officer to lie, "[he] would laugh in my face and say, 'Do you think my home and my wife and my

kids and my family are worth what you're asking me to do for some scum ball?' " The prosecutor suggested that, if the police were lying, they would "make up something better," and that, if A.F. were lying, she would say she was raped instead of saying she did not know whether she was raped.

Aknin argues the prosecutor improperly vouched for the police witnesses. We agree some of the prosecutor's statements were improper. The prosecutor argued factual matters outside the record, such as the likelihood the officers would be prosecuted or would risk their homes and families if they lied, to support the veracity of the testifying officers. (See *People v. Woods* (2006) 146 Cal.App.4th 106, 114-115 [prosecutor vouched for police officers by arguing factual matters outside the record, such as the officers' experience and financial obligations].)

But assuming defense counsel should have objected to these statements, Aknin has not shown that the failure to do so was prejudicial. The prosecutor made the statements in the context of arguing that Aknin had not shown the officers conspired against him or intentionally ignored evidence, and that, if the officers were lying, they would have made up testimony that was more incriminating than their actual testimony. Moreover, the officers' testimony was not central to the prosecution's case. Their testimony only concerned what happened after the officers arrived at the scene and after the charged crimes had been completed. The evidence primarily implicating Aknin in the charged crimes was the testimony of A.F. and Griffith, the photographs, and the medical and DNA evidence.

5.      References to A.F. as Victim

Aknin filed a motion in limine asking the court to preclude the prosecutor and prosecution witnesses from referring to A.F. as "the 'victim. '" Aknin requested a ruling that the court, parties, and all witnesses refer to Aknin and A.F. by their names. The People opposed the motion, arguing they should be permitted to refer to A.F. as the " 'alleged victim,' " and to Aknin as the " 'defendant.' " At the hearing on the motion, the court stated: "It is my practice to refer to the victim as the alleged victim. It is my practice to refer to the defendant as the defendant."

Aknin contends his trial counsel should have objected or moved to strike when, on several occasions, the prosecutor and prosecution witnesses referred to "the victim" rather than "the alleged victim." Aknin has not shown his counsel was prejudicially ineffective. The references Aknin cites did not dominate the trial. To the contrary, during testimony, the prosecutor and the witnesses frequently referred to A.F. by her name. The prosecutor also repeatedly referred to A.F. by her name during closing argument. Even if counsel should have objected or moved to strike when the prosecutor or a witness referred to "the victim," it is unlikely these references had a significant prejudicial impact.

6. Prejudice

Aknin contends his counsel's failure to object to the above evidence and argument was prejudicial because the allegedly inadmissible evidence, considered cumulatively, improperly bolstered the credibility of A.F. and Griffith. We disagree. First, as we discussed above, much of the evidence Aknin identifies was admissible, and several of the challenged portions of closing argument were proper. Second, as we also discussed above, Aknin has not shown the potentially objectionable portions of testimony and argument were prejudicial. Considering the potentially objectionable evidence cumulatively, we conclude Aknin has not shown a reasonable probability that, absent his counsel's allegedly deficient performance, the outcome of the trial would have been different. (See *Strickland, supra,* 466 U.S. at pp. 687-688, 694; *Carter, supra,* 30 Cal.4th at p. 1211.)

Aknin argues the credibility of A.F. and Griffith was suspect because they lied to the police about certain matters; Griffith lied at the preliminary hearing about whether he threatened to shoot Aknin; A.F. was working as a prostitute; and Griffith had been convicted of, and imprisoned for, rape and robbery. But these issues were fully aired before the jury, and A.F. and Griffith admitted the conduct Aknin identifies. Moreover, portions of Aknin's account may have seemed implausible to the jury in light of other evidence. For example, Aknin's claim that A.F.'s injuries resulted from his falling on her and grabbing her neck as he fell may have appeared unlikely in light of the medical

43

evidence that he must have held her throat for at least 50 seconds. Similarly, since Aknin directed the cab driver to go to the Garden Motel, his claim that Griffith was A.F.'s pimp and coincidentally happened to be staying at that motel may have appeared implausible to the jury. We are not persuaded that the potentially objectionable evidence identified by Aknin had a significant impact on the jury's assessment of the witnesses' credibility.

## C. *The Rape Conviction* (*Count 1*)

### 1. Forcible Rape

Aknin argues he was "wrongly convicted" (boldface and capitalization omitted) of forcible rape (§ 261, subd. (a)(2)) because, if he raped A.F., he instead committed rape of an unconscious person (§ 261, subd. (a)(4)).[15] We disagree.

"Forcible rape is defined as 'an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] (2) [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' (§ 261, subd. (a)(2).)" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022 (*Griffin*).) To establish force within the meaning of section 261, subdivision (a)(2), " 'the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' [Citation.]" (*Griffin, supra,* 33 Cal.4th at pp. 1023-1024.) Consistent with this standard, the trial court instructed the jury that: "Intercourse is accomplished by force if a person uses enough physical force to overcome the woman's will." (See CALCRIM No. 1000.)

The evidence supports the conclusion that, if Aknin had intercourse with A.F., she did not consent to the intercourse and Aknin accomplished the intercourse by force or violence. (See § 261, subd. (a)(2); *Griffin, supra,* 33 Cal.4th at p. 1022; CALCRIM No. 1000.) A.F. testified that, although she initially agreed to have sex with Aknin, she

---

[15] The distinction is relevant to sentencing. Section 667.61 provides for a mandatory 15-years-to-life sentence for a defendant who is convicted of forcible rape and who personally inflicted great bodily injury on the victim; this sentencing provision does not apply to rape of an unconscious person. (See § 667.61, subds. (b), (c)(1), (e)(3).)

changed her mind and told Aknin: " 'I'm done. No more.' " She then walked away. As she walked away, Aknin grabbed her from behind, dragged her into an alley, and choked her into unconsciousness. Aknin then allegedly had intercourse with her. This evidence shows Aknin used physical force sufficient to support a finding that the act of intercourse was against A.F.'s will. (See *Griffin, supra,* 33 Cal.4th at pp. 1023-1024.)

Despite the evidence that A.F. explicitly withdrew her initial consent and Aknin then used physical force to overcome her will, Aknin contends his conviction of forcible rape was improper. He appears to argue that because the force he used rendered A.F. unconscious before he had intercourse with her, the People could *only* prosecute him for rape of an unconscious person and could not prosecute him for forcible rape. We reject this argument. Although the evidence could have supported a charge of rape of an unconscious person, it also supports the charge and conviction of forcible rape. Aknin cites no authority holding or suggesting that a forcible rape charge is improper when a victim expresses a lack of consent, and the defendant then overpowers the victim by using so much force that the victim is rendered unconscious before there is sexual penetration.[16]

The cases Aknin cites do not support his position. Aknin cites *People v. Dancy* (2002) 102 Cal.App.4th 21, 34 for the proposition that a defendant may be convicted of rape of an unconscious person where the defendant caused the victim to become unconscious. In *Dancy*, the defendant was charged with, and convicted of, rape of an unconscious woman; the court did not address a charge of forcible rape. (*Id.* at pp. 29, 31.)

---

[16] In a footnote, Aknin cites *People v. Smith* (2010) 191 Cal.App.4th 199, 205, in which the court held a single act of intercourse can support only one rape *conviction*. But a single act of intercourse may be chargeable under multiple theories that are supported by the evidence. (See *ibid.* [" '[O]nly one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code.' [Citation.]"])

Aknin's reliance on *People v. Kusumoto* (1985) 169 Cal.App.3d 487 is also misplaced. In *Kusumoto*, the court held the evidence was insufficient to support a conviction of forcible penetration with a foreign object because the penetration occurred while the victim was asleep, and the only force used was that necessary to accomplish the penetration. (*Kusumoto* at pp. 490, 494.) Here, in contrast, there is evidence Aknin used force against A.F. after she expressed her lack of consent.[17]

Finally, Aknin argues the forcible rape conviction is improper because the alleged act of intercourse occurred about 30 minutes after he rendered A.F. unconscious. Aknin appears to base this argument on Griffith's response to the prosecutor's question about how much time passed between the time he left the 7-Eleven store and the time he heard the noise outside his room. Griffith stated: "Okay. I'm gonna guess, and my guess is gonna be not more than an hour but—more than half an hour but not more than an hour. Somewhere like 35 minutes." The jury was not required to conclude that Griffith's equivocal testimony on this point established the amount of time that passed between the time Aknin rendered A.F. unconscious and the time he had intercourse with her.

2.      Sufficiency of Evidence

Aknin contends there is insufficient evidence to sustain his conviction of rape. To determine whether the prosecution met its burden to prove a charge beyond a reasonable doubt, we apply the "substantial evidence" test. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) Under that standard, we " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable

_____

[17] The remaining cases cited by Aknin are inapposite and did not involve forcible rape charges. In *People v. Lyu* (2012) 203 Cal.App.4th 1293, 1301-1302, the court held the defendant's convictions of (nonrape) sexual offenses against an unconscious person were not supported by substantial evidence because the evidence showed the victim was conscious. In *People v. Ing* (1967) 65 Cal.2d 603, 606-607, 612, questioned on other grounds in *People v. Tassell* (1984) 36 Cal.3d 77, 89, fn. 8, the court held there was sufficient evidence to support the defendant's conviction of rape where he administered an intoxicating substance that prevented the victim from resisting.

46

trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*Id.* at pp. 260-261.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Zamudio, supra,* 43 Cal.4th at pp. 357-358.)

Ejaculation is not an element of rape. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1079.) All that is required is "sexual penetration, however slight." (§ 263; *Wallace* at p. 1079.) The penetration necessary to show rape is "sexual penetration and not vaginal penetration. Penetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232, disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8; see *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366.)

Applying the above standards, we conclude there is substantial evidence supporting Aknin's conviction of rape. Based on A.F.'s testimony, the jury could have concluded that, after A.F. told Aknin she was done and walked away, he grabbed her, dragged her into the alley, and choked her until she was unconscious. A.F. did not recall ever knowingly having sexual contact with Aknin. But, as Aknin concedes, the evidence establishes there was sexual contact between him and A.F. A.F. was a contributor to DNA on Aknin's scrotum and penis. A.F. was the source of DNA on the outside of the

47

used condom found at the scene; and Aknin and A.F. were contributors to DNA on the inside of the condom.

Based on the evidence of sexual contact, and A.F.'s testimony that no sexual contact occurred before Aknin rendered her unconscious, the jury reasonably could infer that the sexual contact occurred after A.F. was unconscious. And, the jury reasonably could infer that the type of sexual contact Aknin engaged in after A.F. was unconscious was not oral sex, but was instead sexual penetration with his penis of A.F.'s external genital organs. (See *People v. Karsai, supra,* 131 Cal.App.3d at p. 232; *People v. Quintana, supra,* 89 Cal.App.4th at p. 1366.)

Other evidence supported the inference that the type of sexual contact that occurred was penetration of A.F.'s genital organs. A.F. testified that, when she regained consciousness, she was naked from the waist down. Griffith and Beaumont also testified A.F. had no pants on when they saw her. A.F. was using a tampon that evening, but it was removed during her encounter with Aknin. Griffith testified that, when he went outside his room, Aknin was on the ground making what appeared to be digging or swimming motions with his arms, and he looked like he might be having a seizure. In light of this evidence and the evidence that there was sexual contact of some type between Aknin and A.F., the jury reasonably could infer that Aknin attempted to have intercourse with A.F. and achieved at least slight penetration.

Aknin argues that some of the forensic evidence did not point to a conclusion he raped A.F. For example, Aknin was excluded as a contributor of DNA found in A.F.'s vagina, on her pubic area, and on the tampon; he was excluded as a contributor of spermatozoa found on A.F.'s body; and he was excluded as a source of DNA found in two of the stains on A.F.'s jeans while a test of the third stain was inconclusive. Although A.F. was menstruating, no blood was detected on the condom or on Aknin's scrotum, penis, or hands. Low levels of amylase, which is found in low concentrations in vaginal fluids and in high concentrations in saliva, were found on the outside of the condom.

48

This evidence does not establish that the jury's verdict was unsupported by substantial evidence. As to the absence of blood on Aknin and the condom, criminalist Mona Ten testified that, if a woman were menstruating with a limited flow of blood, it would be possible for blood to be on the condom, but it would not necessarily occur. Nurse practitioner Diana Emerson testified to the same effect. Similarly, the test results did not permit a conclusion as to which bodily orifice was the source of the amylase on the outside of the condom. Ten testified the results of the testing on the condom were consistent with a penis with a condom on it being inserted into A.F.'s vagina and were also consistent with a penis with a condom on it being placed into A.F.'s mouth. And, while the evidence would support a conclusion Aknin did not ejaculate and may not have fully penetrated A.F., it does not establish a lack of substantial evidence supporting a finding of at least slight penetration.

In his reply brief, Aknin notes that Griffith testified he did not see Aknin's hips move up and down, and Griffith did not testify he saw Aknin sexually penetrate A.F. We conclude, however, that Griffith's testimony about what he did see (Aknin on the ground making swimming or digging motions), in combination with other evidence, could support an inference that Aknin sexually penetrated A.F.

After reviewing the record in the light most favorable to the judgment, we conclude there is substantial evidence such that a jury reasonably could find Aknin guilty of rape beyond a reasonable doubt. (See *People v. Clark, supra,* 52 Cal.4th at p. 943.)

D.     *Assault with Intent to Commit Rape* (*Count 2*)

The parties correctly note that assault with intent to commit rape is a lesser included offense of forcible rape and that Aknin may not be convicted of both offenses based on the same conduct. (See *People v. Lewis* (1977) 75 Cal.App.3d 513, 521; *People v. Moran* (1973) 33 Cal.App.3d 724, 730.) The conviction of assault with intent to commit rape (count 2) is reversed.

E.     *The Sentence*

The court stated it was staying the sentences on counts 2 through 4 under section 654; the court did not specify sentences for those counts. As the Attorney

General notes, the correct procedure is to impose a sentence for each count and enhancement and then to stay execution of sentence as necessary to comply with section 654. (*People v. Duff* (2010) 50 Cal.4th 787, 795-796; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469, 1471-1472.) That way, if the unstayed sentence is reversed, a valid sentence will remain. (*Id.* at p. 1469.) Failure to follow this procedure results in "an unauthorized absence of sentence" that we must correct on appeal. (*Id.* at pp. 1467, 1472.) We will remand for the trial court to impose and stay sentences on count 3 and the enhancement associated with that count, and on count 4.

IV.
DISPOSITION

The conviction of assault with intent to commit rape (count 2) is reversed. The case is remanded for the trial court to hold a new sentencing hearing, at which it shall impose, and stay under section 654, sentences on (1) the conviction of assault by means of force likely to produce great bodily injury (count 3) and the enhancement associated with that conviction, and (2) the conviction of battery with serious bodily injury (count 4). In all other respects, the judgment is affirmed.


_____
Humes, J.


We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.


50